IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CHRISTINE MARTIN, | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S RENEWED THIRD MOTION FOR SANCTIONS** |
| Plaintiff, | |
| v. | Case No. 2:19-cv-00289-RJS-DBP |
| SGT, INC. f/k/a TGT, INC., a Wyoming corporation, | Chief Judge Robert J. Shelby |
| Defendant. | Chief Magistrate Judge Dustin B. Pead |

This case centers on the oral agreement between the parties—Defendant SGT, Inc. (SGT), formerly known as TGT, and Plaintiff Christine Martin—whereby SGT used Martin's artwork on souvenir products it sold.[1]  Core to this dispute is whether SGT, through its owner, Tim Tasker, purchased only a license to use Martin's artwork or purchased full ownership of the artwork it received from Martin.[2]

But there has been little progress on resolving the merits of this case.[3]  Rather, this litigation has been plagued by protracted discovery disputes between the parties.  Now before the court is SGT's Renewed Third Motion for Sanctions.[4]  SGT alleges Martin has failed or refused to comply with her discovery obligations, pursuant to the Federal Rules of Civil Procedure and

---

[1] *See generally* Dkt. 53, *Second Amended Complaint* ¶¶ 28–91; Dkt. 64, *SGT's Answer and Counterclaims to Second Amended Complaint* ¶¶ 28–91.

[2] *See* Dkt. 53 ¶¶ 38–40 (discussing "terms of the license"); Dkt. 64 ¶¶ 5–7, 9 (First counterclaim for declaratory relief: no breach of contract).

[3] *See* Dkt. 52, *Minute Order for Proceedings on November 22, 2019* (granting Defendant's Motion to Dismiss First Amended Complaint); Dkt. 53; Dkt. 63, *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Second Amended Complaint*); Dkt. 64; Dkt. 67, *Martin's Answer to SGT's Counterclaim*.

[4] Dkt. 126.

this court's prior orders, and has intentionally altered and destroyed material evidence.[5]  SGT seeks terminating sanctions and the entirety of its attorneys' fees and costs associated with fact discovery.[6]  For the reasons explained below, SGT's Motion is GRANTED.

## BACKGROUND

SGT's current Motion for Sanctions is the latest in a series of discovery disputes between the parties, the history of which has been detailed at length in previous court orders.[7]  Here, the court will focus on the facts relevant to the instant Motion for Sanctions as they have evolved since the issuance of Chief Magistrate Judge Pead's Order Granting SGT's Second Motion for Sanctions in January 2021.[8]

### I.    Martin's Response to SGT's First Set of Requests for Production

The longest-running discovery dispute between the parties revolves around SGT's First Set of Requests for Production and Martin's responses thereto.  SGT served Martin with its First Requests for Production on July 13, 2020, seeking production of electronically-stored information (ESI) with specifications pursuant to Federal Rule of Civil Procedure 34 and the then-governing Scheduling Order.[9]  Two days after the deadline to respond had passed, Martin

---

[5] *Id.* at 5.

[6] *Id.* at 18–19; Dkt. 136, *SGT's Reply in Support of its Renewed Third Motion for Sanctions* at 13–15.

[7] *See* Dkt. 71, *Discovery Ruling and Order*; Dkt. 77, *Order Granting SGT's Second Motion for Sanctions*; Dkt. 120, *Order Overruling Plaintiff's Objection to Order Granting Sanctions*.  SGT first moved for sanctions on July 29, 2019.  Dkt. 36, *SGT's First Motion for Sanctions*.  SGT sought to quash a subpoena Martin issued to a nonparty, prior to the parties' Rule 26(f) conference, and its associated attorneys' fees.  *See id.*  The Motion was later rendered moot by the issuance of a temporary stay of discovery.  *See* Dkt. 46, *Order Staying Discovery* at 4.

[8] *See* Dkt. 77.

[9] Dkt. 69-7, *Defendant's First Set of Interrogatories and Requests for Production* at 2–3 (citing Fed. R. Civ. P. 34(b)(1)(C)); Dkt. 66, *Scheduling Order* at 2 (requiring production of ESI "in the format it is maintained in the normal course"); *see also* Dkt. 69-7 at 4–6 (requesting specified communications, documents, and things SGT believes relevant to this litigation).

filed a Motion for an Extension of Time to Respond.[10]  Then, on August 21, 2020, Martin

produced a single, 916-page PDF "consisting of disparate, disorganized documents" which,

according to SGT, failed to respond to the majority of its requests.[11]  In response to Martin's

Motion for Extension of Time, Magistrate Judge Pead ordered her to respond to SGT's First Set

of Requests for Production with "complete, non-evasive responses and a complete production no

later than September 4, 2020."[12]

     The next day, SGT informed Martin of specific deficiencies in her document production

and requested her compliance with Judge Pead's Order.[13]  Martin took the position that she had

already complied with Judge Pead's Order.[14]  When the parties conferred via telephone

conference two months later, Martin again asserted that she had produced all documents in her

possession that were responsive to SGT's Requests, but offered to "look for and provide any

additional responsive documents."[15]

     On October 12, 2020, Martin produced approximately 2,700 new documents, again in

"scattershot fashion."[16]  This new production, according to SGT, still omitted documents it had

specifically requested.[17]  SGT again expressed dissatisfaction with Martin's production,[18] and

the parties convened another teleconference at which Martin assured SGT she would continue to

---

[10] *See* Dkt. 68, *Martin's Motion for Extension of Time to Respond to Discovery Requests*; Dkt. 71 at 1.

[11] Dkt. 73-1, *Benjamin Simler Declaration* ¶ 3.

[12] Dkt. 71 at 4–5.

[13] Dkt. 73-1 ¶ 4; Dkt. 73-4, *Exhibit C to Simler Declaration* at 2–3.

[14] Dkt. 73-1 ¶ 4; Dkt. 73-4 at 2–3.

[15] Dkt. 73-1 ¶¶ 5, 7–9; Dkt. 74-1, *Declaration of Timothy Smith* ¶¶ 8–9.

[16] Dkt. 73-1 ¶¶ 7–9.

[17] *Id.* ¶ 9.

[18] *Id.*; Dkt. 73-7, *November Email Communications* at 1–2.

search for documents responsive to its requests.[19]  On November 18, 2020, Martin produced an additional eighteen documents responsive to SGT's Requests.[20]

The next month, SGT filed a Motion for Sanctions asserting that Martin still had not provided a complete production, as required by Judge Pead's Order, and that the documents Martin had produced failed to comply with that Order and the Federal Rules of Civil Procedure.[21]  SGT requested terminating sanctions or, in the alternative, a series of sanctions designed to partially cure SGT's prejudice resulting from Martin's inadequate document production.[22]  The Motion being fully briefed,[23] on January 29, 2021, Judge Pead issued an Order Granting SGT's Motion for Sanctions (hereinafter Order Granting Sanctions).[24]  However, Judge Pead did not grant SGT's request for terminating sanctions because "lesser sanctions may be effective, will serve the interests of justice[,] and give substance to the court's preference for resolution on the merits."[25]  Instead, Judge Pead ordered Martin to:

1. Coordinate with SGT regarding [] engagement of an independent forensic ESI Vendor, to be paid for by Plaintiff[;]  . . . provide the vendor access to all ESI repositories to which [Plaintiff] has access[;]  . . . and have the vendor appropriately collect, process, and catalog all such ESI.  The vendor shall then make that material available to SGT for inspection and copying[.]
2. No later than February 16, 2021, produce to SGT all documents that were in existence by October 9, 2020, that Plaintiff has withheld on the basis of a privilege or work product objection.

---

[19] Dkt. 74-1 ¶¶ 17–21; Dkt. 73-1 ¶ 10.

[20] Dkt. 73-1 ¶ 11.

[21] Dkt. 73, *SGT's Second Motion for Sanctions* at 5–9.

[22] *Id.* at 11.

[23] Dkt. 74, *Martin's Opposition to SGT's Motion for Sanctions*; Dkt. 75, *SGT's Reply in Support of its Motion for Sanctions*.

[24] Dkt. 77.

[25] *Id.* at 10.

3. Reimburse SGT all its reasonable expenses related to [Plaintiff's] prior document productions' improper formats and to the efforts SGT has made to secure [Plaintiff's] compliance with this Court's Orders, to include the expenses associated with this Motion.

4. No later than February 8, 2021[,] the parties shall meet and confer and submit a proposed, stipulated amended scheduling order for review by the court.

5. After SGT receives the ESI described above and any remaining outstanding productions, file a certification of "complete production."[26]

Martin filed a timely Objection to Judge Pead's Order Granting Sanctions.[27] The Objection was fully briefed,[28] and on March 14, 2022 this court concluded that "Judge Pead applied the correct legal standard as to each challenged issue and none of his findings were clearly erroneous."[29] Accordingly, the court ordered Martin to comply with the terms of the Order Granting Sanctions."[30]

Following the issuance of the Order Granting Sanctions, Martin's counsel "contacted Xact Data Discovery (Xact), an independent forensic ESI vendor, to engage them to collect, process, and catalog Ms. Martin's ESI[.]"[31] On February 4, 2021, Martin's counsel emailed counsel for SGT, stating "[w]e are using Xact Data to collect information from Ms. Martin's devices."[32] SGT's counsel responded that they "are not familiar with Xact" and objected that Martin's counsel had not "coordinated with [them] as was ordered."[33] SGT's counsel requested

---

[26] *Id.* at 11.

[27] Dkt. 80, *Objection to Magistrate Judge Decision*.

[28] Dkt. 86, *SGT's Response to Martin's Objection to Magistrate Judge Decision*.

[29] Dkt. 120 at 9.

[30] *Id.* at 20.

[31] Dkt. 131-1, *Timothy Smith Declaration* ¶ 2.

[32] Dkt. 126-1, *Timothy Getzoff Declaration* at 9 (Exhibit 1: February 4, 2021 email correspondence between counsel).

[33] *Id.*

Xact's contact information, inquired about their capabilities, and indicated that, "[o]nce we have verified to our satisfaction that this proposed vendor has the necessary expertise, we will provide instructions/specifications for collection, processing, etc., so that we don't end up incurring further expense that Ms. Martin will be liable for."[34]

The parties later conferred via teleconference regarding the engagement of Xact and the processes for ESI collection and production.[35]  The discussion centered on "Xact's suitability to act as the ESI vendor[,] . . . the types of data that would be collected, the way it would be collected [and] produced, and possible timelines for its collection, sorting, and production."[36] Xact assured SGT's counsel that it "had the ability to preserve and recover deleted data, to deduplicate and provide metadata for the earlier productions, and to correctly process Stuffit files and to create authentic static images . . . that would be usable for trial[.]"[37]

On February 8, 2021, counsel for SGT emailed Martin's counsel confirming that, "[w]e are good with Xact performing the ESI collection."[38]  SGT's counsel also confirmed their understanding that Xact "expect[s] to collect all documents within a week and will provide a listing of files for to discuss [sic] what should be produced."[39]

A month later, on March 8, 2021 Martin's counsel sent SGT's counsel three spreadsheets purportedly listing the complete file collections from Martin's devices: (1) 1,672 files from

---

[34] *Id.*

[35] *See* Dkt. 126-1 ¶ 4; Dkt. 126-2, *Benjamin Simler Declaration* ¶¶ 13–16; Dkt. 131-1 ¶¶ 4–7.

[36] Dkt. 131-1 ¶ 5.

[37] Dkt. 126-2 ¶ 14. Stuffit files are compressed archive files that generally require specialized expertise to collect and process into authentic static images because they are formatted for older software versions that are no longer supported or used by newer computing systems.  *Id.* ¶ 8.

[38] Dkt. 131-6, *Exhibit F: February 2021 Email Correspondence Between Counsel* at 2.

[39] *Id.*

fourteen CD-ROMs, (2) 97,487 files from an IBM external hard drive, and (3) 168,291 files from a Seagate external hard drive.[40]  In total, the spreadsheets listed 267,450 files[41] by file name and contained each file's description, extension, full path, size, date created, date modified, and date accessed.[42]  Martin provided "no other explanation for what these files contained, whether or how the files were organized, or any other information to enable SGT to determine whether any of these voluminous files were relevant or responsive."[43]  On March 18, 2021, upon reviewing the spreadsheets, SGT's counsel observed that they appeared not to contain a complete inventory of all Martin's devices—notably "there were no files after 2018" and it appeared that "none of Martin's personal computer files were collected[.]"[44]  After this omission was brought to her counsel's attention, Martin produced an additional spreadsheet "purportedly containing the contents of her current desktop and totaling an additional 28,219 files" on April 12, 2021.[45]

---

[40] Dkt. 126 at 7; *see* Dkt. 126-1 ¶ 10; Dkt. 126-1 at 18–255 (Exhibit 4: IBM external hard drive excel spreadsheet); *see also* Dkt. 126-1 at 13 (Exhibit 2: March 8–18, 2021 email correspondence between counsel) ("Xact finished their inventory of the contents of Ms. Martin's devices.  I've attached the spreadsheets showing the results."); Dkt. 131-9, *Exhibit I: March 8, 2021 Email Correspondence Between Counsel* at 2 (same).

[41] Dkt. 126 at 7; *see also* Dkt. 126-1 ¶ 10.

[42] *See, e.g.*, Dkt. 126-1 at 19 (Exhibit 4: IBM external hard drive excel spreadsheet) ("name: 13627.emlx; description: file, existing; ext.: emlx; full path: \.Trashes\501\13627.emlx; size: 1924; created: 11/7/2005 9:37; Modified 11/7/2005 9:37; accessed 1/1/2021 20:22"); *id.* at 102 (Exhibit 4: IBM external hard drive excel spreadsheet) ("name: Go Go snowgirl.tif; description: file, existing; ext.: tif; full path: \Users\Accounts\TGT\Stylie Stickers\Stylie Sticker Ski Catalog\catalog images\Go Go snowgirl.tif; size: 1213298; created: 10/1/2002 13:56; Modified 10/18/2002 15:11; accessed 11/25/2019 16:11").

[43] Dkt. 126 at 7–8.

[44] Dkt. 126-1 ¶ 11; *see also id.* at 12 (Exhibit 2: March 8–18, 2021 email correspondence between counsel) ("We were able to complete an initial pass through the file listings earlier today.  Our review has raised several issues . . . Essentially all of the files in these spreadsheets appear to predate March 29, 2017, which suggests that Ms. Martin has not yet provided XACT [sic] with access to the computer(s) she has used since then, to her phone, to any other current external storage devices, or to any of her online accounts[.]"); Dkt. 131-10, *Exhibit J: March 2021 Email Correspondence Between Counsel* at 2 (same).

[45] Dkt. 126 at 8; *see* Dkt. 126-1 ¶ 12; *see also* Dkt. 131-13, *Exhibit M: March–April 2021 Email Correspondence Between Counsel* at 2 (April 9, 2021 email stating, "Xact has finished its imaging of Christine's desktop computer and is generating reports on the files. . . . We'll have those to you on Monday.").

Also on March 18, 2021, SGT's counsel requested the metadata for Martin's email files so SGT could tailor its requests for production.[46]  After SGT's counsel reaffirmed this request,[47] Martin's counsel produced the requested Metadata Report on June 10, 2021.[48]  The Metadata Report provided, for each email, the:

- Document ID,
- Sender's address,
- Recipient's address,
- Cc address,
- Bcc address,
- Email subject,
- Sent date,
- Sent time,
- Received date,
- Received time, and
- Attachment index.[49]

Based on the Metadata Report, SGT's counsel identified potentially relevant emails and returned the Metadata Report to Martin's counsel, indicating the emails SGT would like produced.[50]

In the same March 18, 2021 email, SGT's counsel made a preliminary assessment of which materials listed in the three spreadsheets (cataloguing the contents of the CDs, the IBM

---

[46] Dkt. 216-1 at 12 (Exhibit 2: March 8–18, 2021 email correspondence between counsel) ("For email files, we may expect to be able to further narrow the list if Xact provides us with certain metadata[.] . . . Please have Xact provide this requested information.").

[47] Dkt. 131-13 at 3–4 (following up on requested email metadata).

[48] Dkt. 131-14, *Exhibit N: June 2021 Email Correspondence Between Counsel* at 5 (June 10, 2021 email stating: "Please find a metadata report generated by Xact Data summarizing Christine Martin's email collection attached."); *see also* Dkt. 126-1 at 320–1995 (Exhibit 10: Metadata Report).

[49] *See* Dkt. 126-1 at 321 (Exhibit 10: Metadata Report) (spreadsheet headings).

[50] Dkt. 131-15, *Exhibit O: June 22, 2021 Email Correspondence from SGT's Counsel to Martin's Counsel* at 5 (Stating: "Attached is the Metadata spreadsheet, to which we have added a new column A entitled 'H&H Request.' Every entry in this column marked with an 'X' indicates an email we want produced."); *see also* Dkt. 126-1 at 321 (Exhibit 10: Metadata Report) (spreadsheet headings).

hard drive, and the Seagate hard drive) might have relevant information.[51]  In the following

months, the parties' counsel discussed informally interviewing Martin to help identify the

contents of particular directories reflected in the spreadsheets and ascertain their relevance prior

to production.[52]  By October 18, 2021, these discussions had devolved and SGT never conducted

an informal interview with Martin to identify relevant directories or documents.[53]  It is unclear

when, to what extent, and in what manner Martin's counsel produced any of the files catalogued

---

[51] Dkt. 126-1 at 12 (Exhibit 2: March 8–18, 2021 email correspondence between counsel) (March 18, 2021 email stating: "We have made a preliminary assessment of which materials listed within the three spreadsheets sent to us might have relevant information; the attached spreadsheets 'hide' cells with the file information of files that we suspect to be irrelevant, with all visible cells containing information we believe could be relevant.").

[52] *See* Dkt. 131-13 at 4 (March 30, 2021 email stating: "regarding holding an informal discussion with your client to help identify the contents of particular directories and thus enable a further elimination of unnecessary data from a production.  Have you managed to discuss this with your client yet, and can we move forward with setting a time to do this?"); *id.* at 3 (April 1, 2021 email stating: "Could you send us a list of the file directories referenced . . . so that we can discuss the relevance of each of their contents with Christine?"); *id.* at 2 (April 1, 2021 email stating: "As I noted during our call, the Excel files I attached to that 3/18 email show all the files/directories in question (we already 'hid' the rows for all the files that we didn't think potentially include anything of relevance)."); *see also* Dkt. 131-14 at 2 (June 18, 2021 email stating: "The issues I want to discuss during our meet and confer include: . . . status and update on the documents collected by Xact and our outstanding request to obtain information on various folders and documents[.]").

[53] Dkt. 131-18, *Exhibit R: September–October 2021 Email Correspondence Between Counsel* at 5 (October 14, 2021 email from SGT's counsel stating: "Below are the questions and topics we would like to address with Ms. Martin."); *id.* (October 14, 2021 email from Martin's counsel stating: "We'll take a crack at answering these in writing first. We'll get responses to you as soon as we can and then determine if we still need a call."); *id.* (October 15, 2021 email from SGT's counsel stating: "The only reason we aren't taking Ms. Martin's deposition now is your representation that you would first produce her for this interview.  Since you are now reneging on that agreement, we need to take her deposition ASAP."); *id.* at 4 (October 15, 2021 email from Martin's counsel stating: "I left you a message.  We didn't say[] Ms. Martin won't be available.  We are simply trying to answer the questions in writing first if possible."); *id.* (October 18, 2021 email from SGT's counsel stating: "While we will look at your written answers to these questions, we still need to set Ms. Martin's deposition and would like to do that ASAP."); *id.* at 2 (October 25, 2021 email from Martin's counsel stating: "Please see Christine's answers to your questions below."); *see also* Dkt. 131-15 at 2 (stating: "You have declined our request for an informal interview of your client to go through the files and identify their contents for us.  You stated that your client would go through the files herself, identify the ones with relevant and responsive documents, and produce them to us. . . . Please keep us posted on your progress and when we can expect to receive the documents.").

in the March 18 or April 12 spreadsheets.[54]  Martin filed her Certificate of Complete Production on September 2, 2021.[55]

     SGT's counsel deposed Martin on November 3, 2021.[56]  SGT's counsel presented Martin with the three March 18 spreadsheets cataloguing her files from the CDs, IBM hard drive, and Seagate hard drive.[57]  While Martin recognized the files listed in the spreadsheets, she stated she had never seen the spreadsheets before and had not gone through them to identify which files would be responsive to SGT's requests for documents.[58]  Nonetheless, Martin affirmed that she only placed art she did for SGT on the CDs.[59]  As to the hard drives, Martin explained to SGT's counsel that she would have to review the spreadsheet to identify any references to SGT.[60]  Martin stated that, while she could review the spreadsheets and discern which files on the IBM and Seagate hard drives concerned SGT, no one else would be capable of identifying such files unless they had "TGT" or "the name of one of the TGT designs" in the name.[61]  However, in

---

[54] *See* Dkt. 126 at 9 (referencing "Martin's last document production in February 2021.").

[55] Dkt. 98.

[56] *See* Dkt. 126-1 at 264–316 (Exhibit 7: November 3, 2021 deposition of Christine Martin) [hereinafter *Martin Deposition*].

[57] *Id.* at 182:17–183:23.

[58] *Id.* at 183:24–184:24.

[59] *Id.* at 185:7–17 ("Q: And just looking at the file names, can you tell whether these—these files would be relevant to—to this case?  A: Everything on these CD-R are art that I did for TGT to use on stickers. . . . Q: Did you make a point, then, for the CD – these 14 CDs to only put TGT art on them?  A: Yes.").

[60] *Id.* at 187:1–25; *see, e.g.*, *id.* at 187:12–17 ("Q: Do you know if your IBM external drive had . . . any TGT files on it?  A: I honestly cannot tell you without going through it.").

[61] *Id.* at 188:1–189:18; *see, e.g.*, *id.* at 188:16–23 ("Q:Is there any way that I or somebody that doesn't know what you know can go through this and determine which of these files are TGT files or not?  A: You could scroll through and if it says "TGT" or has the name of one of the TGT designs, you would know it was a TGT.  But other than that, no."); *id.* at 189:10–18 ("Q: So is there any way . . . other than going through and actually looking at the file itself to see what's in there, is there anyone other than you that could figure out what the TG – what the TGT files are?  A: No.  It's just me.").

response to questions from her own counsel, Martin contradicted her earlier statements and asserted that "Tasker would be able to identify any of the TGT files, and any of the employees that worked for him would be able to do the same."[62]

## II.    The July 2018 Email from Martin to Tasker[63]

Martin brought this action against SGT in April 2019, asserting claims for breach of contract, declaratory relief, and contributory copyright infringement.[64]  The parties' dispute centers on the oral license agreement between the parties whereby SGT used Martin's artwork on products it sold, and the subsequent sale of the right to use Martin's artwork to another entity.[65]  Martin alleges SGT purchased only the non-transferable right to use her artwork, whereas SGT claims it purchased ownership of all copyrights in the artwork it received from Martin.[66]

During discovery, both Martin's counsel and SGT produced copies of a July 2018 email exchange between Martin and Tim Tasker of SGT.[67]  In it, Martin writes to Tasker to explain her invoicing calculation.  She states, "Here is my thinking for invoicing.  It is a lot more than you are used to so before I send the invoice i [sic] want to explain my thinking then if you are in

---

[62] *Id.* at 190:17–191:1.

[63] The date between Martin's and Tasker's copies of this email differs by one day—July 27 and July 28 respectively. The parties appear to agree this difference arose because Tasker was in Sweden when he received this email and the difference in date reflects that time difference.  *See* Dkt. 126 at 11 n.3; Dkt. 125, *SEALED July 28, 2018 Email from Martin to Tasker* [hereinafter *Martin July 2018 Email*] at 2–3 (stating "Hope Sweden is relaxing!"); Dkt. 126-1 at 319 (Exhibit 9: July 27, 2018 email from Martin to Tasker) [hereinafter *Tasker July 2018 Email*] (stating the same).

[64] *See* Dkt. 2, *Original Complaint*; Dkt. 53, *Second Amended Complaint*; *see also* Dkt. 63 (dismissing Martin's claim for vicarious copyright infringement pursuant to Federal Rule of Civil Procedure 12(b)(6)).

[65] *See generally* Dkt. 53 ¶¶ 28–91; Dkt. 64, *SGT's Answer and Counterclaims to Second Amended Complaint* ¶¶ 28–91.

[66] *See* Dkt. 53 ¶¶ 38–40 (discussing "terms of the license"); Dkt. 64 ¶¶ 5–7, 9 (First counterclaim for declaratory relief: no breach of contract).

[67] *See* Dkt. 126 at 9.

disagreement PLEASE let me know why you think so and maybe we can work something out."[68] Following her explanation of her calculations, in SGT's production of the email, Martin writes: "What are your thoughts?  Its [sic] difficult because you are buying intellectual property as well as hourly wage these days."[69]  In Martin's production of the email, she writes: "What are your thoughts?  Its [sic] difficult because you are buying <u>use of</u> intellectual property as well as hourly wage these days."[70]  There is no dispute that the parties' two versions of this email are nonidentical.[71]

Martin's counsel produced her copy of the email in response to the Order Granting Sanctions' requirement to produce "all documents that were in existence by October 9, 2020, that Plaintiff has withheld on the basis of privilege or work product objection."[72]  The email was produced by Martin as a PDF which included Tasker's reply message, accepting Martin's proposed invoice calculation, and Martin's own forwards of the email exchange to her counsel.[73]  Martin forwarded the email to her counsel first on February 12, 2019, stating, "Here is another email where I say 'you are buying USE OF intellectual property[.]'"[74]  Martin forwarded the email to her counsel a second time on December 30, 2019.[75]

---

[68] *See Martin July 2018 Email* (sealed); *Tasker July 2018 Email*.

[69] *Tasker July 2018 Email*.

[70] *Martin July 2018 Email* (sealed) (emphasis added).

[71] *See* Dkt. 131, *Martin's Memorandum in Opposition to SGT's Renewed Third Motion for Sanctions* at 13; Dkt. 126 at 10–11.

[72] Dkt. 77 at 11.

[73] *Martin July 2018 Email* (sealed).

[74] *Id.* (emphasis in original).

[75] *Id.*

Tasker retained his own copy of the email he received from Martin, which SGT produced as the native format version of the original.[76]

Following Xact's collection of Martin's emails, SGT's counsel observed that the Metadata Report purportedly cataloguing all Martin's emails did not include this July 2018 email exchange between Martin and Tasker.[77]  On September 10, 2021, SGT's counsel emailed Martin's counsel to inquire about the omitted email.[78]  SGT's counsel noted "this email is not to be found" in the Metadata Report and concluded that, "[i]t seems clear, therefore, that your client deleted or destroyed this email at some point."[79]  SGT's counsel inquired: "(1) when did she destroy this email, (2) how or why was it destroyed, and (3) what other emails or documents were destroyed or deleted by your client?"[80]  Martin's counsel responded, "This email has been produced.  Please see Bates numbers CM004321 and CM004322"—referring SGT's counsel to the PDF of the email produced in response to Judge Pead's order.[81]

During her deposition, SGT's counsel questioned Martin about the July 2018 email and its absence from the Metadata Report.  Martin responded that she "ha[d] no idea."[82]  SGT's counsel questioned Martin about the email's deletion, to which Martin responded: "I wouldn't

---

[76] *Tasker July 2018 Email.*

[77] *See* Dkt. 126 at 11.

[78] *Id.* at 12; *see* Dkt. 126-1 at 1996–98 (Exhibit 11: September 10, 2021 email correspondence between counsel).

[79] Dkt. 126-1 at 1998 (Exhibit 11: September 10, 2021 email correspondence between counsel).

[80] *Id.*

[81] *Id.* at 1997.

[82] *Martin Deposition* at 171:11–15 ("Q: If . . . the master spreadsheet of all your emails has everything, why is this email . . . not in there?  A: I have no idea."); *id.* at 172:18– 21 ("Q: At some point, you must have deleted the original email, right?  A: I have no idea.  Look how many emails I have.  I have no idea."); *id.* at 173:21–24 ("Q: [I]f it got deleted, do you have any explanation for how it got deleted?  A: No.  I mean, I don't know.  I have no idea.").

call out one email and say, 'Oh, this one got deleted.'  I deleted emails all the time."[83]  But

immediately thereafter, Martin clarified that she understood her obligation to retain her emails

related to the case and averred, "I didn't delete a single thing from the moment I got the phone

call from Tasker telling me what he had done.  I didn't delete a single thing."[84]

SGT's counsel presented Martin with her counsel's production of the July 2018 email,

including the messages forwarding it to her attorneys and highlighting the words "use of" for

their attention.[85]  Counsel asked her, "so you thought, out of this entire email, those two words,

'use of,' were important that you wanted your attorneys to see, right?"  Martin responded, "Yes.

I've already said yes to that now three times."[86]  SGT's counsel went on to ask her, "in your

mind, the words 'use of,' as opposed to just buying intellectual property, is a big distinction,

right?"  Martin replied, "Well, yeah, one is a license, for sure."  Counsel then asked, "The words

'use of' certainly support . . . your position in this case?"  Martin replied, "It adds to it."[87]

When SGT's counsel confronted Martin with the difference between her counsel's

production of the July 2018 email and SGT's, she denied making any alteration to the email and

asserted she "ha[d] no idea what happened."[88]

> Q: Ms. Martin, isn't it true that when you forwarded this email to your attorneys,
>     you added the words "use of" to the original email?
> A: No.  That's actually not true.
> Q: And then you deleted the original so you wouldn't have a record of what the
>     original email said?

---

[83] *Id.* at 172:22–173:4.

[84] *Id.* at 173:5–12.

[85] *See id.* at 176:4–11.

[86] *Id.* at 176:22–177:1.

[87] *Id.* at 177:9–19.

[88] *Id.* at 180:10–11; *see also id.* at 179:8–180:21.

A: No.

Q:  . . . Would you -- would you agree with me that somebody altered one of these emails?

A: I don't know what happened.  There are instances where I am emailing people, and I forward and then keep going, or I copy and paste into a new email and then write.  I have no idea what happened here.

Q: Would you agree with me that somebody altered one of these emails?

A: No, I'm not going to agree.  I -- I'm not going to agree to that.  Like I said, I don't know what happened here.

Q: So whose email do you think is the correct one?  Tim Tasker's, [] or the one you forwarded to your attorney []?

A: Honestly, I have no idea because I don't even know what happened here.[89]

Since Martin's deposition, in November 2021, Martin's counsel has been in communication with Xact to discuss the July 2018 email and has "assigned to Xact the full investigation of the details of this discrepancy[.]"[90]  Xact has been unable to locate the original July 2018 email anywhere in Martin's email account, Seagate hard drive, or IBM hard drive.[91]

## PROCEDURAL HISTORY

SGT first filed its Third Motion for Sanctions on November 24, 2021.[92]  Although the Motion was fully briefed,[93] it was dismissed without prejudice due to the simultaneous pendency of Martin's then-pending Objection to Judge Pead's Order Granting Sanctions and the intertwined nature of the merits of SGT's Second and Third Motions for Sanctions.[94]

---

[89] *Id.* at 179:19–180:21.

[90] Dkt. 131-1 ¶¶ 20–22.

[91] Dkt. 131-21, *Exhibit U: Declaration of Michael Gutierrez* ¶¶ 13–14.

[92] Dkt. 104, *SGT's Original Third Motion for Sanctions*.

[93] *See* Dkt. 111, *Martin's Opposition to SGT's Original Third Motion for Sanctions*; Dkt. 114, *SGT's Reply in Support of its Original Third Motion for Sanctions*.

[94] Dkt. 117, *Docket Text Order Denying SGT's Original Third Motion for Sanctions without Prejudice*.  *Compare* Dkt. 104, *with* Dkt. 73.

After this court's Decision Overruling Martin's Objection to Judge Pead's Order Granting Sanctions,[95] SGT refiled its Third Motion for Sanctions on April 1, 2022.[96]  That Motion is fully briefed,[97] and the court has heard oral argument.[98]  For the reasons explained below, the court GRANTS SGT's Renewed Third Motion for Sanctions.[99]

## LEGAL STANDARDS

A "court may exercise its inherent powers to sanction bad-faith conduct that abuses the judicial process."[100]  With this power, the court may sanction litigants both for spoliation of evidence and for failure to follow the court's discovery orders.[101]  Additionally, under the Federal Rules of Civil Procedure, if a party fails to obey a discovery order, the court "may issue further just orders."[102]  Such orders "may include . . . dismissing the action or proceeding in whole or in part."[103]  But because dismissal is a harsh sanction, it must be exercised with restraint.[104]

---

[95] Dkt. 120.

[96] Dkt. 126.

[97] *See* Dkt. 131; Dkt. 136.

[98] *See* Dkt. 141, *Minute Entry for Proceedings on August 23, 2022.*

[99] Dkt. 126.

[100] *Xyngular v. Schenkel*, 890 F.3d 868, 873 (10th Cir. 2018) (citation omitted).

[101] *See, e.g.*, *Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1194–95 (D. Utah 2011) (issuing sanctions for spoliation of evidence); *Lee v. Max Intern., LLC*, 638 F.3d 1318, 1321 (10th Cir. 2011) (issuing sanctions for failure to follow discovery orders).

[102] *See* Fed. R. Civ. P. 37(b)(2)(A).

[103] *Id.* at 37(b)(2)(A)(v).

[104] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion."); *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1044 (10th Cir. 2005) ("Because dismissal is such a harsh sanction, it is appropriate only in cases of willfulness, bad faith, or some fault of petitioner." (internal citations and quotation marks omitted)); *LaFleur v. Teen Help*, 342 F.3d 1145, 1151 (10th Cir. 2003) ("Dismissal is a severe sanction; therefore, it should be imposed only if a lesser sanction would not serve the ends of justice." (internal citations and quotation marks omitted)).

16

The Tenth Circuit has instructed district courts to consider five so-called *Ehrenhaus* factors in determining whether to impose the sanction of dismissal: "(1) the degree of actual prejudice to the opposing party, (2) the degree of interference with the judicial process, (3) the litigant's culpability, (4) whether the litigant was warned in advance that dismissal was a likely sanction, and (5) whether a lesser sanction would be effective."[105]  Dismissal with prejudice "is proper only when these factors outweigh the judicial system's strong predisposition to decide cases on the merits."[106]  The Tenth Circuit has further emphasized the third and fifth factors, instructing that dismissal is only appropriate when: (a) the court finds, by clear and convincing evidence, some fault, willfulness, or bad faith by the sanctioned party,[107] and (b) a "lesser sanction would not serve the ends of justice."[108]

## ANALYSIS

SGT moves for sanctions pursuant to Federal Rules of Civil Procedure 37(b)(2)(A), 37(b)(2)(C), 37(c)(1), and 37(e)(2) for Martin's alleged "failure or refusal to comply with her discovery obligations and this Court's prior orders," and "intentional alteration and destruction of critical evidence."[109]  SGT argues that terminating sanctions are appropriate based on the *Ehrenhaus* factors.[110]  SGT also argues an award of its reasonable expenses related to Martin's

---

[105] *LaFleur*, 342 F.3d at 1151 (citing *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992)).

[106] *Cobb v. Benzon*, 2:18-cv-975-DAK, 2020 WL 3219804, at *1 (D. Utah Jun. 15, 2020) (citing *DeBardeleben v. Quinlan*, 937 F.2d 502, 504 (10th Cir. 1991)).

[107] *Xyngular*, 890 F.3d at 873 (citing *Chavez*, 402 F.3d at 1044); *see also id.* at 873–74 ("[A]lthough our circuit has no precedent precisely on point, persuasive authority from our sibling circuits indicates that a clear and convincing standard applies." (citations omitted)).

[108] *LaFleur*, 342 F.3d at 1151 (internal citations and quotation marks omitted).

[109] Dkt. 126 at 5.

[110] *See id.* at 18; *see also id.* at 19–23 (applying *Ehrenhaus* factors).

alleged discovery misconduct, including attorneys' fees, is warranted by Rule 37(b)(2)(C) and by this court's discretion to award costs and attorneys' fees related to a party's spoliation of evidence.[111]

As an initial matter, Martin asserts SGT's Motion should be denied because SGT "failed to adequately meet and confer regarding either issue identified in the Motion[,]" as required by Local Rule 37-1(a)(1).[112]  Martin goes on to argue that no sanctionable conduct has taken place and she has "discharged her obligations" under the court's prior orders.[113]  Regarding SGT's spoliation allegations, Martin does not dispute the discrepancy between the two productions of the July 2018 email or the absence of the Martin version of the email from the Metadata Report purportedly cataloguing all her emails.[114]  Rather, Martin asserts SGT's Motion is premature because "it remains unclear how the discrepancy happened" or what its significance is.[115]  Even were the court to conclude that sanctionable conduct including spoliation had occurred, Martin argues terminating sanctions are unnecessary because there has been "no prejudice to SGT" and "dismissal is not warranted to avoid interference with the judicial process[]" when the court could instead exclude Martin's production of the July 2018 email from evidence.[116]

The court first addresses Martin's procedural argument before turning to the occurrence of any sanctionable conduct.

---

[111] *See id.* at 18–19, 23–24.

[112] *Id.* at 15 (citing DUCivR 37-1(a)(1)).

[113] *See* Dkt. 131 at 11 ("Martin discharged her obligations under the Order long before this dispute came to a head. . . . No sanctionable conduct took place here.").

[114] *See id.* at 12–13.

[115] *Id.* at 12.

[116] *Id.* at 14–15.

## I.       Martin's Procedural Argument is Unavailing

Martin argues the court should deny SGT's Motion for Sanctions because SGT "failed to adequately meet and confer regarding either issue identified in the Motion[,]" as required by Local Rule 37-1(a)(1).[117]  The court finds this argument unavailing.

First, Martin offers no support for applying Local Rule 37-1's meet-and-confer requirement to motions for sanctions based on alleged failure to comply with prior court orders or spoliation.  Nor is the court aware of any authority applying a meet-and-confer requirement in such a scenario.  The one authority Martin cites applied Local Rule 37-1(a) in the context of a motion to compel discovery—not a motion seeking sanctions for a party's failure to comply with such an order.[118]  While Local Rule 37-1 references "Fed. R. Civ. P. 26-37" in articulating its meet-and-confer requirement, other language in the Rule suggests this requirement applies to "discovery disputes" and should be complied with "before seeking court assistance."[119]  The parties are past the point of resolving their discovery dispute before seeking court assistance. Rather, this is the third time the parties have required court assistance related to Martin's response to SGT's First Requests for Production.[120]

Furthermore, even if Rule 37-1(a) applied, SGT has made multiple attempts to meet and confer with Martin regarding its dissatisfaction with her document production and its spoliation

---

[117] *Id.* at 15 (citing DUCivR 37-1(a)(1)).

[118] *See id.* (citing *United States v. United Park City Mines Co.*, 2:19-cv-00200-BSJ-DBP, 2018 WL 5637413, at *1 (D. Utah Oct. 31, 2019)).

[119] DUCivR 37-1(a)(1); *id.* (a)(2)(A) (requiring efforts to meet and confer to identify the discovery disclosure or request at issue, the response, and why it is inadequate); *see also, e.g., Burgi v. Fitness*, 2:19-cv-00151-CMR, 2021 WL 734948, at *6 (D. Utah Feb. 25, 2021) (holding DUCivR 37-1's meet-and-confer requirement inapplicable to a motion for sanctions based on plaintiff's failure to provide initial disclosures because "[p]laintiff's mandatory disclosure obligations under Rule 26 were not in dispute").

[120] *See* Dkt. 71; Dkt. 77, Dkt. 120 (overruling Martin's objection to Dkt. 77).

concerns.  In particular, on September 10, 2021, in an email entitled "Martin v. SGT: Rule 37

Conferral[,]" SGT's counsel alerted Martin's counsel to its concern with the absence or

destruction of the original July 2018 email.[121]  And extensive emails between the parties detail

their ongoing discovery dispute, including a March 23, 2021 email in which SGT's counsel

warns, "[i]f Plaintiff continues to refuse to comply with the Court's orders, we will have no

choice but to seek further recourse from the Court, which may include dismissal or judgment by

default."[122]  This evidence of SGT's repeated attempts to communicate its grievances, coupled

with Martin's insistence that these communications led her "to believe SGT was satisfied with

the steps taken to produce the ESI[,]" leads the court to conclude that no fruitful resolution

would ensue from further conferral between the parties absent court assistance.

## II.     Martin has Failed to Adhere to her Discovery Obligations Pursuant to the Federal Rules of Civil Procedure and this Court's Prior Orders

SGT argues sanctions are warranted because Martin has continually failed to comply with

the court's prior Orders.[123]  SGT asserts Martin has neither produced a subset of relevant

documents nor provided "a clear indication" of which documents are responsive to which

---

[121] Dkt. 126-1 at 1997–98 (Exhibit 11: September 10, 2021 email correspondence between counsel).

[122] Dkt. 131-13 at 4–5; *see also* Dkt. 131-3, *Exhibit C: February 4, 2021 Email Correspondence Between Counsel* at 2 (email from SGT's counsel re: compliance with court order to coordinate regarding engagement of an independent ESI vendor); Dkt. 126-1 at 16 (Exhibit 3: February 16–18, 2021 email correspondence between counsel) (emails from SGT's counsel re: document production); Dkt. 131-8, *Exhibit H: February 2021 Email Correspondence Between Counsel* at 3–4 (February 24, 2021 email from SGT's counsel re: concerns with document production); Dkt. 126-1 at 12 (Exhibit 2: March 8–18, 2021 email correspondence between counsel) (March 18, 2021 email from SGT's counsel re: issues with production); Dkt. 131-13 at 3–5 (March 23 and 30, 2021 emails from SGT's counsel re: issues with document production); Dkt. 131-14 at 2–3 (June 16 and 18, 2021 emails between counsel discussing meet and confer re: document production); Dkt. 131-15 at 2–3 (memorializing meet-and-confer call); Dkt. 126-1 at 260–62 (Exhibit 6: June–July, 2021 email correspondence between counsel) (July 2 and 26, 2021 emails from SGT's counsel re: meet-and-confer call concerning document production issues); Dkt. 131-18 at 2–9 (Sept 30–Oct 25, 2021 emails between counsel discussing outstanding discovery issues).

[123] *See* Dkt. 126 at 15–16 (citing Dkt. 71; Dkt. 77).

Requests for Production.  Rather, it is SGT's understanding that "Martin claims [] she has complied with her discovery obligations by [] providing spreadsheets of hundreds of thousands of documents and putting the burden on SGT to somehow figure out which of the thousands of files are relevant and responsive in this case."[124]  SGT argues Martin has thereby violated her obligations under the Federal Rules of Civil Procedure and this court's prior Orders.[125]

Martin responds that she has complied with Judge Pead's Order Granting Sanctions—and by extension this court's subsequent Order overruling her objection to Judge Pead's Order— because: (1) she coordinated with SGT in engaging Xact as an independent ESI vendor; (2) she provided Xact access all her ESI repositories; (3) Xact collected, processed, and catalogued all such ESI; and (4) Xact made that material available for SGT to inspect and copy.[126]  Martin asserts "SGT has been involved in the collection and sorting process at every step of the way[,]"[127] and she has fully complied with and "discharged her obligations" under the court's orders.[128]  Moreover, Martin asserts she has gone "above and beyond what the Order requires" by helping SGT "navigate and interpret" the spreadsheets cataloguing her ESI and "SGT is free to retrieve additional data from [Xact] at its convenience."[129]

The court agrees with SGT.  Martin's response selectively parses the court's prior orders and abdicates her discovery obligations under the Federal Rules.

--------

[124] *Id.*

[125] *Id.* at 16.

[126] *See* Dkt. 131 at 3.

[127] *Id.* at 5.

[128] *Id.* at 9.

[129] *Id.* at 11; *see also id.* at 9–11 (describing how Martin has assisted SGT to understand the collected data and cull for relevancy).

21

Martin asserts she "has discharged her obligations" under the court's prior orders because she "has indisputably 'had [Xact] appropriately collect, process, and catalog' the ESI and . . . [Xact] has made 'that material available to SGT for inspection and copying.'"[130]  According to Martin, she was not obligated to help SGT organize, or determine the relevance of, the ESI data catalogued in the spreadsheets, but she nonetheless answered SGT's inquiries about the spreadsheets' contents.[131]  Martin states that "SGT is free to retrieve additional data from [Xact] at its convenience."

But Martin, not Xact or SGT, is responsible for producing relevant ESI in response to SGT's Request for Production.  The court's orders did not relieve Martin of her obligations under the Federal Rules of Civil Procedure.  Rather, they called attention to Rule 34 and reinforced Martin's obligations thereunder.[132]  The orders set forth a procedure to help the parties obtain Martin's complete production and move this litigation forward.[133]  That procedure was a sanction under Rule 37, not an absolution of, or substitution for, Martin's usual discovery obligations.[134]  As will be explained, Martin's Opposition to SGT's Motion makes clear she has not fully complied with her Rule 34 discovery obligations.

Rule 34 applies to the production of documents and ESI.[135]  Pursuant to Rule 34(b)(1)(C), a party requesting the production of ESI "may specify the form or forms in which

---

[130] *Id.* at 9 (quoting Dkt. 77 at 11).

[131] *Id.* at 11 (citing Dkt. 131-18 at 2–3 (providing brief written answers to SGT's questions regarding the contents and organization of the spreadsheets)).

[132] *See* Dkt. 77 at 7; Dkt. 120 at 19–20.

[133] *See* Dkt. 77 at 11; Dkt. 120 at 20–21.

[134] *See* Dkt. 77 at 11.

[135] Fed. R. Civ. P. 34 (requiring production of documents, electronically stored information, and tangible things, or entering onto land for inspection and other purposes).

[ESI] is to be produced."[136]  These specifications "may facilitate the orderly, efficient, and cost-effective discovery" of ESI.[137]  If the responding party objects to the requested form, it "must state the form it intends to use" in its response to the requests for production, before making its production.[138]  And, if the request does not specify a form, the responding party must produce ESI "in a form [] in which it is ordinarily maintained or in a reasonably usable form[.]"[139] However, the notes to Rule 34 emphasize that "the option to produce [ESI] in a reasonably usable form does not mean that a responding party is free to convert [ESI] from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation."[140]  For example, "[i]f the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature."[141]

    Rule 34 also requires the responding party to "produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request[.]"[142]  This helps to "protect against deliberate or inadvertent production in ways that raise unnecessary obstacles for the requesting party."[143]

---

[136] *Id.* 34(b)(1)(C).

[137] Fed. R. Civ. P. 34 Advisory Committee notes to 2006 amendment, subdiv. (b).

[138] *Id.*

[139] *Id.* 34(b)(2)(E)(ii).

[140] Fed. R. Civ. P. 34 Advisory Committee notes to 2006 amendment, subdiv. (b).

[141] *Id.*

[142] *Id.* 34(b)(2)(E)(i).

[143] Fed. R. Civ. P. 34 Advisory Committee notes to 2006 amendment, subdiv. (b).

In its First Set of Requests for Production, SGT requested that all ESI "be produced in its native format, maintain all metadata, in the directory (folder) and database structure in which it is maintained in the ordinary course."[144]  SGT also instructed Martin to "clearly identify the specific request(s) to which each document or group of documents you provide is responsive."[145] Thus, SGT specified the form for production of ESI, as it was entitled to under Rule 34(b)(1)(C), and requested a specific organization for production as between the options outlined by Rule 34(b)(2)(E)(i).  Martin broadly objected to these instructions "to the extent they seek the production of [ESI] in a certain specified format."[146]  However, all Martin's objections to SGT's First Requests for Production were later deemed waived.[147]  Even if Martin's objections had not been waived, SGT was entitled to specify a certain format for the production of ESI[148] and Martin's broad objection did not, as advised by the notes to Rule 34, state the alternative form she intended to use for her production.[149]  Thus, Martin was required to produce her ESI in its native format and either organize and label her files to correspond with SGT's requests, or produce them as they were kept in the usual course of business.  Even if Martin opted to produce her files as they were organized in the usual course of business, she still had an "obligation to

---

[144] Dkt. 69-7 at 3.

[145] *Id.* at 2.

[146] Dkt. 73-2, *Martin's Responses to SGT's First Set of Requests for Production* at 4.

[147] *See* Dkt. 71 at 5 ("Plaintiff shall respond to Defendant's . . . First set of Requests for Production by September 4, 2020, but has waived all objections thereto other than with respect to Fifth Amendment privileges[.]"); *see also* Dkt. 73-6, *Martin's Supplemental Responses to SGT's First Set of Requests for Production* (omitting all prior objections).

[148] Fed. R. Civ. P. 34(b)(1)(C).

[149] *See* Fed. R. Civ. P. 34 Advisory Committee notes to 2006 amendment, subdiv. (b); Dkt. 73-2 at 4.

organize the documents in such a manner that [SGT] may determine, with reasonable effort, which documents [were] responsive to its requests."[150]

Martin has been reminded of these obligations in both Judge Pead's Order Granting Sanctions for her discovery misconduct[151] and the Order Overruling her Objections to those Sanctions.[152]  Yet Martin has continually failed to provide complete production in compliance with Rule 34.  SGT represents that Martin's last document production was in February 2021.[153]  Martin does not contest or rebut this assertion.[154]  Since then, Martin, through Xact, has produced spreadsheets cataloguing her ESI[155] but has not produced her relevant and responsive ESI as requested by SGT's First Requests for Production and required by Rule 34 and this court's Orders.

Furthermore, Martin's spreadsheets catalog years of her accumulated ESI totaling hundreds of thousands of files.[156]  The spreadsheets, while expansive, do not provide such information in an organized manner as would allow SGT to "determine, with reasonable effort, which documents are responsive to its requests."[157]  It is Martin's responsibility, as it is the

---

[150] *White v. Wiseman*, No. 2:16-cv-01179-CW-JCB, 2020 WL 3667493, at *2 (D. Utah July 6, 2020).

[151] Dkt. 77 at 7.

[152] Dkt. 120 at 17–20.

[153] *See* Dkt. 126 at 9.

[154] *See generally* Dkt. 131.

[155] *See* Dkt. 126-1 at 13 (Exhibit 2: March 8–18, 2021 email correspondence between counsel) (March 8, 2021 email from Martin's counsel transmitting spreadsheets inventorying the contents of Martin's devices); Dkt. 131-13 at 3 (April 9, 2021 email from Martin's counsel confirming that additional reports cataloguing the contents of Martin's desktop computer will be transmitted the following Monday); Dkt. 131-14 at 4–5 (June 10, 2021 email from Martin's counsel transmitting spreadsheet summarizing Martin's email metadata); *see also, e.g.*, Dkt. 126-1 at 18–255 (Exhibit 4: IBM external hard drive excel spreadsheet); Dkt. 126-1 at 320–1995 (Exhibit 10: Metadata Report).

[156] *See* Dkt. 126 at 7.

[157] *White*, 2020 WL 3667493, at *2.

25

responsibility of any litigant before the court, to comb through her own information and ascertain which files are relevant to the instant litigation.  Indeed, this is something Martin and her counsel must do to organize and prepare her own case.  To shift that burden to SGT, which is ill-positioned to organize and discern the relevance of Martin's information, is not justified under the Rules or this court's orders and is a far cry from "orderly, efficient, and cost-effective discovery[.]"[158]

### III.    Martin has Altered and Destroyed Material Evidence

Spoliation is the intentional destruction or significant alteration of evidence "or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."[159]  "Sanctions for spoliation of evidence are appropriate when the party had a duty to preserve the evidence because it knew or should have known that litigation was imminent, and the other party was prejudiced by the destruction of the evidence."[160]

SGT argues that Martin indisputably understood both her obligation to preserve evidence and the importance of the July 2018 email, as evinced by her deposition testimony and by her forwarding the email to her counsel.[161]  Based on the dates Martin forwarded the email to her counsel (February 12, 2019 and December 30, 2019) and the email's later absence from Xact's Metadata Report (June 10, 2021), SGT infers that "Martin must have deleted this email at some

---

[158] Fed. R. Civ. P. 34 Advisory Committee notes to 2006 amendment, subdiv. (b).

[159] *Philips Elecs. N. Am. Corp.*, 773 F. Supp. 2d at 1194–95; *see also Moreno v. Taos Cty. Bd. of Comm'rs*, 587 F. App'x 442, 444 (10th Cir. 2014).

[160] *Moreno*, 587 F. App'x at 444; *see also Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009); *Philips Elecs.*, 773 F. Supp. 2d at 1195 ("[L]itigants have a duty to preserve documents or materials—including electronic documents and materials—that may be relevant to ongoing and potential future litigation.  In most cases, the duty to preserve is triggered by the filing of a lawsuit, but that duty may arise even before a lawsuit is filed if a party has notice that future litigation is likely.").

[161] Dkt. 126 at 17.

point during this litigation."[162]  Furthermore, SGT points out that all traces of Martin's version of the original July 2018 email—including Martin's forwards to her counsel—are now gone from Martin's ESI, such that only Martin's counsel retains the produced version of the email stating "you are buying the use of intellectual property."[163]  SGT argues that, "[i]n view of the evidence of record, no reasonable person could argue that Martin did not alter key language from this email and later delete the original and all other versions to cover her tracks."[164]

Martin does not dispute the discrepancy between the two productions of the July 2018 email,[165] nor does she dispute that the email can no longer be found in any of her ESI repositories.[166]  Instead, Martin argues that SGT's argument is premature because it remains "unclear how the discrepancy happened" or what its significance is.[167]

Parties to a lawsuit have a duty to preserve evidence that may be relevant to ongoing or potential future litigation.[168]  Martin filed her Complaint initiating this action on April 29, 2019.[169]  At the very least, she had an obligation to preserve relevant evidence from that date

---

[162] *Id.*

[163] *Id.* at 17–18.

[164] Dkt. 136 at 8.

[165] Dkt. 131 at 13.

[166] Dkt. 131-21 ¶¶ 13–14 (confirming that Xact reviewed Martin's email account and two external hard drives and was unable to locate the July 2018 email).

[167] Dkt. 131 at 12.  Martin frames this argument as an issue of "ripeness."  *Id.* at 12–13.  However, ripeness is a justiciability doctrine drawn from "Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Nat'l Park Hosp. Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003) (internal citation and quotation marks omitted).  Martin does not argue that the alleged spoliation issue implicates Article III's case and controversy requirement or the prudence of this court's jurisdiction.  *See* Dkt. 131 at 12–13.  Rather, her argument appears to assert that this court should exercise its discretion and deny SGT's Motion without prejudice to afford the parties additional time to investigate what has occurred.  *See id.*

[168] *See Philips Elecs.*, 773 F. Supp. 2d at 1195.

[169] *See* Dkt. 2.

forward.[170]  It is also evident that Martin was in possession of her copy of the July 2018 email at

the time of filing her Complaint and understood the email was relevant to her claims.[171]  But now

Martin does not possess any copy of the July 2018 email.[172]  From this timeline, it is clear that

Martin had a duty to preserve relevant evidence, understood the relevance of the July 2018

email, and nonetheless deleted or failed to preserve this email.  Thus, regardless of whether she

deliberately deleted the email or failed to preserve it, Martin spoliated evidence.

Beyond the deletion or failure to retain material evidence, the discrepancy between the

parties' productions of the July 2018 email raises serious concern regarding the alteration of

evidence.  Martin asserts that SGT's Motion is premature because it is presently unclear how the

discrepancy arose.[173]  However, this argument ignores the fact that it is Martin's loss of her

original copy of the July 2018 email which has prevented the parties from definitively

determining how the discrepancy occurred.  Since the discrepancy came to light, Martin and her

counsel have had nearly a year to investigate and attempt to ascertain how it arose.[174]  At oral

argument, Martin's counsel clarified that they have asked Xact to review Martin's ESI

repositories again in search of the July 2018 email, asked Martin to look into whether she has

other email repositories where she might find the email, and searched counsel's own email

---

[170] The court notes that, as the Plaintiff who initiated this action, Martin could anticipate the likelihood of this litigation well ahead of filing her Complaint.  However, as it is unnecessary to addressing the current allegations of spoliation, the court will not determine when in advance of filing Martin's duty to preserve evidence arose.

[171] Martin forwarded the July 2018 email to her litigation counsel first on February 12, 2019, stating "[h]ere is another email where I say 'you are buying USE OF intellectual property[,]'" and again on December 30, 2019, approximately eight months after filing her Complaint.  *See Martin July 2018 Email* (sealed) at 2–3.

[172] *See* Dkt. 131-21 ¶¶ 13–14.  At oral argument, Martin's counsel clarified that the PDF copy of the July 2018 email was produced by Martin's counsel from the law firm's communications; it was not found in or produced from Martin's documents or ESI.

[173] *See* Dkt. 131 at 13.

[174] *See id.* (stating that counsel first became aware of the discrepancy during Martin's deposition).

repositories to locate a native format copy of the email forwarded from Martin.  However, counsel has not investigated whether Martin's native format email could be retrieved from her email provider's server and has no knowledge of whether any attempt has been made to locate the email from either the law firm's internal server or its email provider's server.

SGT hired its own ESI vendor, which obtained Tasker's native format version of the July 2018 email from Microsoft's email server.[175]  SGT's ESI vendor has reviewed that email, found no indication it was altered, and explained that, "[w]hile it may be possible to manipulate a file once it has been pulled from an online server, [they] do not know of any way for a person to modify an email on the Microsoft server."[176]

Xact has averred that "[t]he best way to determine which email is authentic is to review the original native email message from both the sender's mailbox and the recipient's mailbox."[177]  But because the only available copy of Martin's version of the July 2018 email omits the metadata related to the original email string, SGT's ESI vendor asserted "there is no way to verify the accuracy of th[e] PDF email or whether it was subsequently altered after it was original[ly] sent from [] Martin to [] Tasker."[178]  Thus, both parties acknowledge that, due to the unavailability of Martin's native copy of the July 2018 email, it is not possible to know with absolute certainty how the discrepancy between the productions occurred.

Absent Martin's native copy of the July 2018 email, or any admission from the responsible party, the court is left with only circumstantial evidence of how the discrepancy

---

[175] Dkt. 126-1 at 2002–03 (Exhibit 12: declaration of Christopher Schmidt).

[176] *Id.*

[177] Dkt. 131-21 ¶ 12.

[178] Dkt. 126-1 at 2004 (Exhibit 12: declaration of Christopher Schmidt).

arose.  However, all such evidence points to one conclusion—that Martin altered the email, sent it to her counsel, then deleted all her other copies:

- Only Martin's PDF copy of the July 2018 email, which does not include the metadata related to the email string, contains the words "use of."[179]

- All other copies of the July 2018 email were produced by SGT, in their native format complete with metadata, and do not contain the words "use of."[180]

- The addition of the words "use of" are, by her own admission, helpful to Martin's position in this case.[181]

- Martin retains no native copy of the disputed email as would enable a definitive determination of when and how this discrepancy occurred.[182]

This uncontroverted evidence leads the court to infer that Martin intentionally altered the email to add language helpful to her position and then deleted all other copies in her possession which could be used to undermine her forgery.  This finding is supported, at a minimum, by clear and convincing evidence.[183]  Clear and convincing evidence is that which "tilt[s] the evidentiary scales in the affirmative when weighed against the evidence [] offered in opposition."[184]  In other

---

[179] *See id.* at 2003–04.

[180] *See Martin July 2018 Email* (sealed) at 2–3; Dkt. 126-1 at 2002 (Exhibit 12: declaration of Christopher Schmidt); Dkt. 131-21 ¶¶ 10–11.

[181] *See Martin Deposition* at 176:22–177:19.

[182] *See* Dkt. 131-21 ¶¶ 13–14.

[183] *See Xyngular*, 890 F.3d at 873–74 (applying the clear and convincing standard to determination of dispositive sanctions).

[184] *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

words, the evidence is sufficient to convince the court that "the truth of its factual contentions [is] highly probable."[185]

Neither Martin nor her counsel offer any alternative explanation of how the discrepancy between the parties' production, and the loss of all native copies of Martin's version of the July 2018 email, occurred.[186]  Instead, Martin requests additional time to investigate the discrepancy and its significance.[187]  But Martin and her counsel have had nearly a year to investigate the source of the discrepancy.  Even then, Martin fails to specify what additional investigation remains.  Tasker has produced the native format July 2018 email from his email server, which reveals no evidence of fabrication or alteration by him or SGT.[188]  Despite the protracted timeline of this dispute, neither Martin nor her counsel have found a native format copy of her version of the July 2018 email to reveal any alteration, or lack thereof, on her end of things.  The cumulative circumstantial evidence and complete lack of any other reasonable explanation leave the court convinced that Martin altered the July 2018 email, before forwarding it to her counsel, then deleted all copies in her possession.  The court agrees with SGT that the facts clearly point to Martin's culpability.[189]

And SGT has clearly been prejudiced by this alteration and destruction of evidence. Martin asserts that, even if she altered evidence, there has been no prejudice to SGT or interference with the judicial process which would not be remedied by excluding Martin's

---

[185] *Id.*

[186] *See* Dkt. 131 at 12–13.

[187] *Id.* at 12.

[188] *See* Dkt. 126-1 at 2002–03 (Exhibit 12: declaration of Christopher Schmidt).

[189] *See* Dkt. 136 at 8.

version of the email.[190]  But this argument wholly ignores the harm that spoliation or alteration of evidence does to the opposing party and the judicial process.  "The submission of falsified evidence substantially prejudices an opposing party by casting doubt on the veracity of all of the culpable party's submissions throughout litigation."[191]  "[I]t imposes substantial burdens not only on the opposing party, but also on the judicial system itself, as the extent and relevance of the fabrication are investigated."[192]  Spoliation and alteration of evidence creates harm beyond the existence of the falsified evidence itself.  If parties only faced a risk that their fabricated evidence would be excluded if discovered, they "would infer that they have everything to gain, and nothing to lose[.]"[193]

By altering and destroying material evidence, Martin has undermined the discovery process, her own credibility, the authority of the court, and the legitimacy of this litigation—which she initiated.  Coupled with Martin's continued insistence that no harm resulted, this urges the imposition of serious sanctions.

---

[190] Dkt. 131 at 14.  At oral argument, Martin's counsel also argued that SGT was overemphasizing the material significance of the July 2018 email and asserted that counsel's litigation plan and analysis of the case merits never relied on the email.  But even fabrication of evidence with "absolutely no materiality or relevance to the substantive issues" "bears on character and credibility, which often is broadly at issue in a given case."  *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1181 (10th Cir. 2009).  Such fabrication, regardless of the substantive materiality of the altered evidence, substantially burdens the opposing party, the judicial system, and the integrity of the litigation.

[191] *Garcia*, 569 F.3d at 1180.

[192] *Id.* at 1181.

[193] *Id.* at 1180.

IV.     **Terminating Sanctions are Warranted Pursuant to the *Ehrenhaus* Factors**

Based on Martin's discovery misconduct and spoliation, SGT seeks dismissal of this action.[194]  SGT asserts terminating sanctions are warranted under the *Ehrenhaus* factors.[195]  SGT also requests an award of its attorneys' fees and costs associated with the entire fact discovery process.[196]

 Martin responds that dismissal of an action "represents an extreme sanction" which is unwarranted here.[197]  Martin argues that, even if the court finds she spoliated or fabricated evidence, the appropriate sanction would be exclusion of her version of the July 2018 email.[198]  Dismissal, according to Martin, is not justified or necessary to avoid interference with the judicial process or prejudice to SGT.[199]  The court disagrees.

In *Ehrenhaus v. Reynolds*, the Tenth Circuit articulated five factors for courts to consider before imposing dismissal as a sanction: "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions."[200]  The factors are not a "rigid test; rather, they represent criteria for the district court to consider[.]"[201]

---

[194] *See* Dkt. 126 at 23–24.

[195] *Id.* at 18–23.

[196] *Id.* at 23–24.

[197] Dkt. 131 at 14 (quoting *Brigham Young Univ. v. Pfizer, Inc.*, 282 F.R.D. 566, 570 (D. Utah 2012)).

[198] *Id.*

[199] *Id.* at 14–15.

[200] 965 F.2d at 920–21.

[201] *Id.* at 921.

Applying the *Ehrenhaus* factors, the court concludes that terminating sanctions are warranted and appropriate.

### A.  SGT has Suffered Actual Prejudice

Martin argues that SGT has not suffered actual prejudice warranting dismissal because any prejudice cause by her spoliation and alteration of evidence would be cured by excluding Martin's PDF version of the July 2018 email.[202]  The court disagrees.

SGT has been prejudiced both by Martin's continued discovery misconduct, and by her alteration and deletion of the July 2018 email.  Over the last two years, Martin's inadequate and improper production of documents has caused significant delay to this litigation and increased costs for SGT.[203]  Martin's response to SGT's First Request for Production of Documents was originally due August 12, 2020.[204]  Over two years later, although required by the Federal Rules of Civil Procedure and three orders from the court, Martin's full production remains outstanding. During this time, SGT twice sought court assistance to compel Martin to comply with her basic discovery obligations.[205]  SGT also incurred increased expenses as Martin's inadequate production of documents required additional efforts to ascertain which documents, out of Martin's disorganized production, are relevant and responsive to its requests.[206]

---

[202] Dkt. 131 at 14.

[203] *See, e.g.*, *Jones v. Thompson*, 996 F.2d 261, 264 (10th Cir. 1993) (finding plaintiffs prejudiced the defendants "by causing delay and mounting attorney's fees"); *Ehrenhaus*, 965 F.2d at 921 (concluding that plaintiff's misconduct "prejudiced the defendants by causing delay and mounting attorney's fees").

[204] *See* Dkt. 69-7 at 2, 7.

[205] *See* Dkt. 73; Dkt. 126.

[206] *See* Dkt. 126 at 19.

And SGT has been significantly prejudiced by Martin's alteration and deletion of the July 2018 email. The fabrication of evidence taints the credibility and legitimacy of the entire litigation process, not just the credibility of the altered evidence itself.[207] The introduction of fabricated evidence "cast[s] doubt on the veracity of all of the culpable party's submissions throughout litigation."[208] SGT is left with uncertainty as to whether Martin may have altered or deleted other evidence; SGT now must either attempt to corroborate her submissions, expending additional of time and money, or must accept the possibility that other documents are inaccurate.[209] Thus, Martin's ongoing discovery misconduct, alteration of evidence, and spoliation have prejudiced SGT beyond what could be rectified by excluding at trial her production of the July 2018 email.

### B. *Martin's Misconduct Interfered with the Judicial Process*

Martin likewise argues that "dismissal is not warranted to avoid interference with the judicial process."[210] Martin argues, even if the court finds she spoliated or fabricated evidence, the appropriate sanction would be to exclude her production of the July 2018 email.[211] But this argument fails to account for Martin's ongoing discovery misconduct, violation of this court's orders, or the deeper impact of her alteration and spoliation of evidence in a judicial proceeding.

---

[207] *See Garcia*, 569 F.3d at 1180–81.

[208] *Id.* at 1180.

[209] *Id.*

[210] Dkt. 131 at 14.

[211] *Id.*

Martin has had no fewer than four chances to make good her discovery obligations:[212] (1) in response to SGT's First Request for Production;[213](2) in response to Judge Pead's August 2020 discovery order;[214](3) in response to Judge Pead's Order Granting Sanctions;[215] and (4) in response to the most recent Order Overruling Martin's Objections to Judge Pead's Order Granting Sanctions.[216]  This continuous disregard for both the court's orders and her obligations under the Federal Rules not only hinders the court's management of its docket, but undermines its ability to ensure the integrity of the proceedings before it.[217]

Additionally, Martin's alteration and spoliation of evidence prejudices the court and its administration of the judicial process to the extent it introduces uncertainty, requires additional investigation into the fabrication, and undermines the validity of the litigation process.[218]  The court must ensure that all parties enjoy the right to a fair and impartial litigation process.  The introduction of falsified evidence tarnishes and undermines that process and interferes with the court's ability to make an honest and true determination of justice under the law.  Martin's alteration and destruction of material evidence undermines the discovery process, her own

---

[212] *See Lee*, 638 F.3d at 1321 ("Plaintiffs in this case were given no fewer than three chances to make good their discovery obligation: first in response to [defendant's] document requests, then in response to the October 2009 order, and finally in response to the January 2010 order.  Plaintiffs failed at all three turns.  And three strikes are more than enough to allow the district court to call a litigant out.").

[213] Dkt. 69-7.

[214] Dkt. 71.

[215] Dkt. 77.

[216] Dkt. 120.

[217] *See Jones*, 996 F.2d at 265 (concluding plaintiff "repeatedly ignored court orders and thereby hindered the court's management of its docket and its efforts to avoid unnecessary burdens on the court and the opposing party); *Xyngular Corp. v. Schenkel*, 200 F.Supp.3d 1273, 1322 (D. Utah 2016) (concluding that plaintiff's conduct had "deprived the court of the chance to fulfill its fundamental obligation to ensure the integrity of these proceedings.").

[218] *See Garcia*, 569 F.3d at 1181.

credibility, the court's authority, and this litigation's legitimacy.  This weighs strongly in favor of the imposition of serious sanctions, beyond simply excluding the altered evidence.[219]

### C.  Martin Bears Culpability for her Misconduct

SGT argues that Martin's culpability for her misconduct is clear because: (1) she knew of her obligations to comply with the court's orders and the Federal Rules, and nonetheless ignored them; and (2) she deliberately altered and then deleted her native format copies of the July 2018 email, despite knowing the email was important to the litigation and that she had a duty to preserve evidence.[220]  The court agrees.

"Culpability exists where the litigant 'acted with willfulness, bad faith, and fault' and made calculated decisions for strategic use in litigation."[221]  "Bad faith, or culpability, may not mean evil intent, but may simply signify responsibility and control."[222]  "[A]ctual ill will is not required; substantial and prejudicial obduracy or conduct that delays or disrupts the litigation can be enough."[223]

Martin bears culpability both for her failure to comply with the Federal Rules of Civil Procedure and this court's orders, and for her alteration and deletion of evidence.  With respect to her discovery misconduct, she knew her obligations pursuant to the Federal Rules and this court's orders and was reminded of those obligations both in the Order Granting Sanctions and in

---

[219] *Id.* at 1180.

[220] *See* Dkt. 126 at 21–22.

[221] *Emuveyan v. Ewing*, No. 2:19-cv-00616, 2021 WL 3617423, at *6 (D. Utah Aug. 16, 2021) (quoting *Xyngular*, 890 F.3d at 874).

[222] *In re New Canyonlands by Night, LLC*, 415 F. Supp. 3d 1020, 1025 (D. Utah 2019) (internal citation and quotation marks omitted).

[223] *Xyngular Corp.*, 200 F.Supp.3d at 1301 (internal citation and quotation marks omitted); *see also id.* ("Conduct amounts to bad faith if it shows intentional or reckless disregard of the rules." (internal citation and quotation marks omitted)).

the subsequent Order Overruling her Objections to the same.[224]  Yet Martin still failed to organize and identify documents responsive to SGT's Request for Production.  The ESI at issue is within Martin's authority and control, and she has the requisite knowledge to determine which files are relevant and responsive to SGT's requests.  In fact, Martin and her counsel must undertake this process to adequately prepare her own case.  Martin's continued failure to provide SGT with a complete and appropriate production of relevant and responsive documents evidences a reckless or intentional disregard for the rules and has delayed and disrupted the proceeding of this litigation.[225]

Additionally, Martin is culpable for her alteration of, and failure to preserve, her July 2018 email.  Martin was aware of her obligation to preserve evidence and was in control of her ESI repositories, at least until she surrendered them to Xact sometime after February 2021.  It is uncontroverted that Martin had responsibility and control of her native copies of the July 2018 email.[226]  That alone is sufficient to establish she acted with bad faith in her spoliation of the emails.[227]

Beyond the deletion of her July 2018 email, Martin is solely culpable for her alteration of the email prior to forwarding it to her counsel.  As discussed, all the direct and circumstantial evidence considered together establishes that Martin altered the email, adding the words "use of" prior to forwarding it to her counsel.  While she denies there was any alternation, she has posited

---

[224] *See* Dkt. 77 at 6–7, 9; Dkt. 120 at 17–20.

[225] *See Lee*, 638 F.3d at 1321 ("[A] party's thrice repeated failure to produce materials that have always been and remain within its control is strong evidence of willfulness and bad faith, and in any event is easily fault enough, we hold, to warrant dismissal or default judgment.").

[226] *See Philips Elecs.*, 773 F.Supp.2d at 1202.

[227] *See id.* at 1207.

no alternative explanation for how the discrepancy between her and Tasker's productions of the July 2018 email arose.  Based on the record the parties developed over the past nine months, the court is convinced that it is at least highly probable Martin altered the email to bolster her case and transform a "bad fact" into a "good fact."[228]

In summary, Martin is at fault for her continued failure to organize and produce relevant and responsive documents to SGT's First Requests for Production and for her alteration and spoliation of material evidence.  She had responsibility and control of her ESI and nonetheless failed to produce it, as required by the Federal Rules and this court's orders, and altered and deleted an email relevant to the central question of this litigation.  Her "substantial and prejudicial obduracy" has delayed and disrupted this litigation and is enough to find her culpable.[229]

### D.  The Court has Previously Warned Martin that Future Violations of Court Orders Could Result in Dismissal

Martin has been warned that her continued failure to comply with the court's orders and her discovery obligations under the Federal Rules could result in dismissal.  Although he determined that the *Ehrenhaus* factors did not weigh in favor of dismissal, Judge Pead admonished her that "future violations of court orders and rules could result in the extreme sanction of dismissal or default."[230]  While the undersigned has not separately warned Martin that alteration or destruction of evidence could result in dismissal sanctions, such an explicit

---

[228] *See* Dkt. 126 at 22.

[229] *Xyngular Corp.*, 200 F.Supp.3d at 1301.

[230] Dkt. 77 at 10.

warning is not a mandatory prerequisite.[231]  Furthermore, similar to the superfluity of additional

warning not commit perjury after a witness has already sworn to answer truthfully,[232] requiring

admonition for Martin to adhere to her basic obligation not alter evidence would diminish the

seriousness of that obligation and her breach.

### E.  The History of this Dispute Suggests Lesser Sanctions Would not be Efficacious

The "sanction of dismissal is not ordinarily warranted if lesser sanctions would be

effective."[233]  Martin has been previously cautioned that continued failure to abide by court

orders and the Rules could result in dismissal.  Nonetheless, she still has not provided a complete

production to SGT's First Request for Production of Documents despite three court orders

reminding her of her discovery obligations and setting out steps for her compliance.  This

noncompliance is exacerbated by her assertion that she has not only "discharged her obligations"

but gone "above and beyond" what the court required.[234] "[A] party's thrice repeated failure to

produce materials that have always been and remain within its control is strong evidence of

willfulness and bad faith, and in any event is easily fault enough [] to warrant dismissal or

default judgment."[235]

---

[231] *See Rogers v. Andrus Transp. Servs.*, 502 F.3d 1147, 1152 (10th Cir. 2007) (finding "such a warning is not a *sine qua non* for dismissal").

[232] *See Garcia*, 569 F.3d at 1180 ("Once a witness swears to give truthful answers, there is no requirement to warn him not to commit perjury or, conversely to direct him to tell the truth.  It would render the sanctity of the oath quite meaningless to require admonition to adhere to it." (internal citation omitted)).

[233] *Ehrenhaus*, 965 F.2d at 922; *see also LaFleur*, 342 F.3d at 1151 ("Dismissal is a severe sanction; therefore, it should be imposed only if a lesser sanction would not serve the ends of justice." (internal citation and quotation marks omitted)).

[234] Dkt. 31 at 11.

[235] *Lee*, 638 F.3d at 1321.

Additionally, Martin's fabrication and deletion of her July 2018 email is a serious matter reinforcing the imposition of dismissal sanctions.  In this instance, not only is the court convinced that Martin altered and deleted evidence, Martin has had and bypassed her opportunities to admit to her actions when confronted during her deposition and when briefing this issue before the court.[236]

Alteration aside, Martin has avoided even admitting she deleted or lost her copies of the July 2018 email.  She and her counsel have had ample opportunity and time to investigate and recover a native format copy of her July 2018 email yet have failed to do so.  Finally, Martin has also downplayed the significance of any alteration or destruction of evidence asserting that, even if she had spoliated or fabricated evidence, there has been "no prejudice to SGT" and little interference with the judicial process.  This refusal to take accountability, and diminishment of the seriousness of her actions, portends future misconduct or evasion of her discovery obligations.  Given Martin's continued discovery misconduct, and the more recent evidence of her alteration and spoliation of evidence, the court concludes it is justified in ordering dismissal as a sanction.

Considered together, all the *Ehrenhaus* factors weigh in favor of dismissal.  This litigation has been dominated by the parties' discovery disputes related to Martin's inadequate production of documents.  Three prior court orders have been insufficient to procure her compliance with her Rule 34 obligations.  Now there has emerged evidence of Martin's alteration and spoliation of an email material to this litigation.  Even taken individually, Martin's repeated failure to comply with court orders, alteration of evidence, or spoliation of evidence

---

[236] *See Garcia*, 569 F.3d at 1182 (discussing plaintiff's unwillingness to take responsibility for her fabrications).

may warrant dismissal.[237]  Taken together, the court is convinced that nothing less than dismissal

"will suffice to both punish this [plaintiff] and deter others similarly tempted."[238]  The court must

maintain the integrity of judicial proceedings.  Central to this is the ability to trust litigants and

counsel to follow court orders.  "If parties could 'ignore court orders . . . without suffering the

consequences, then the district court cannot administer orderly justice, and the result would be

chaos.'"[239]  Furthermore, the "[d]estruction of evidence cannot be countenanced in a judicial

system whose goal is to find the truth through honest and orderly production of evidence under

established discovery rules."[240]  Considering the facts of the case, the history of this litigation,

and the issuance of prior sanctions for the same conduct, the court concludes dismissal is

warranted.

## V.    SGT is Entitled to Recover its Reasonable Expenses Related to Martin's Discovery Misconduct

Lastly, the court addresses SGT's request for expenses associated with fact discovery

pursuant to Rule 37(b)(2)(C).[241]  SGT requests "the entirety of its expenses related to fact

discovery, in view of Martin's repeated and persistent failures to cooperate and comply with her

fact discovery obligations and the resulting unreliability of the responses and productions she has

made to date."[242]  Rule 37(b)(2)(C) provides that when a party fails to obey a court's discovery

---

[237] *See, e.g.*, *Lee*, 638 F.3d at 1319 ("[N]o one, we hold, should count on more than three chances to make good a discovery obligation."); *Garcia*, 569 F.3d at 1179–82.

[238] *Philips Elecs.*, 773 F. Supp. 2d at 1212 (quoting *Comput. Assocs. Int'l Inc. v. Am. Fundware, Inc.*, 133 F.R.D. 166, 170 (D. Colo. 1990)).

[239] *Id.* at 1213 (quoting *Ehrenhaus*, 965 F.2d at 921).

[240] *Id.* at 1212 (quoting *Comput. Assocs. Int'l Inc.*, 133 F.R.D. at 170).

[241] *See* Dkt. 126 at 5, 23–24; Fed. R. Civ. P 37(b)(2)(C).

[242] Dkt. 126 at 23.

order, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."[243]  The burden is on the disobedient party to show that its failure is justified or that other special circumstances make an award of expenses unjust.[244]

Martin does not address SGT's request for expenses including attorneys' fees; she makes no argument that an award of expenses associated with her discovery misconduct and spoliation would be unjust or that her failures were justified.[245]  As such, Martin has entirely failed to rebut the otherwise mandatory award of fees under Rule 37(b)(2)(C).  Therefore, the court will award SGT its reasonable expenses caused by Martin's discovery misconduct.  SGT submits that this amounts to the entirety of fact discovery.[246]

Judge Pead's original discovery order directed Martin to respond to SGT's First Set of Requests for Production by September 4, 2020.[247]  This was, perhaps, "a little off track but nothing [too] out of the ordinary."[248]  It was after Martin failed to meet the deadline set by Judge Pead, despite SGT's repeated attempts to procure her full and compliant production, that SGT moved for sanctions and fact discovery really came off the rails.[249]  Based on its review of the parties filings, and the circumstances of the longstanding discovery disputes, the court awards

---

[243] Fed. R. Civ. P. 37(b)(2)(C).

[244] Fed. R. Civ. P. 37 Advisory Committee notes to 1970 amendment, subdiv. (b)(2).

[245] *See generally* Dkt. 131.

[246] Dkt. 126 at 24.

[247] Dkt. 71 at 5.

[248] *Lee*, 638 F.3d at 1319.

[249] *See* Dkt. 77 at 2–3 (detailing facts leading up to SGT filing its Motion for sanctions).

SGT its expense and attorneys' fees for all fact discovery from September 5, 2020 up to the present, including expenses and attorneys' fees related to SGT's Second Motion for Sanctions,[250] Third Motion for Sanctions,[251] and Renewed Third Motion for Sanctions.[252]

## CONCLUSION

For the foregoing reasons, SGT's Renewed Third Motion for Sanctions is GRANTED. The court hereby ORDERS that the above captioned matter is dismissed with prejudice. The Clerk of Court is directed to close the case.

SO ORDERED this 28th day of December, 2022.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[250] Dkt. 73.

[251] Dkt. 104.

[252] Dkt. 126.